UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD J. FORD,                    :
                                   :
            Plaintiff              :    No. 3:CV-12-0873
                                   :
      vs.                          :    (Judge Nealon)   **FILED**
                                   :                     **SCRANTON**
THE BUREAU OF PRISONS, et al.,     :
                                   :                     OCT 1 1 2013
            Defendants             :
                                   :              PER
                        **MEMORANDUM**          DEPUTY CLERK

      Plaintiff, Edward J. Ford, Jr., an inmate formerly confined in the Schuylkill Federal

Correctional Institution, Minersville, Pennsylvania ("FCI-Schuylkill"), filed the above captioned

action on May 10, 2012. (Doc. 1, Complaint). Defendants are the following Federal Bureau of

Prisons ("BOP") Employees: Warden Howard Hufford, Associate Warden Patricia Rodman,

Associate Warden Jorge Castandea, Capt. Brent Taggart, Chaplain Patricia Weidman, Lt. Todd

Hansel, Lt. Thomas Reisinger, Case Manager Ronald Scandle, and National Administrative

Remedy Coordinator Harrell Watts. Id. In addition, Ford names unknown employees at the BOP's

Northeast and Southeast Regional Office, and the Federal Bureau of Prisons, its Northeast Regional

Office and its Southeast Regional Office. Id.

      Ford alleges violations of his constitutional rights when he was allegedly retaliated and

conspired against, denied due process for filing appeals and grievances, denied equal protection

rights as a Nation of Islam member, and denied freedom to practice his choice of religion under the

Religious Freedom Restoration Act ("RFRA") and the Religious Land Use of Institutionalized

Persons Act ("RLUIPA"). (Doc. 1, complaint at 3-4). Further, Ford alleges deliberate indifference

and a violation of his due process rights under the Administrative Procedure Act ("APA"). Id. at

6-8. For relief, Ford seeks compensatory and punitive damages, as well as injunctive and declaratory relief. Id. at 39-41.

Presently pending is Defendants' motion to dismiss, or the alternative, for summary judgment. (Doc. 28). The parties have fully briefed the issues and the motion is now ripe for disposition. For the reasons that follow, the Court will grant Defendants' motion to dismiss or, in the alternative, for summary judgment.

## I.    Standards of Review

### A.  Motion to Dismiss

The Court in Williams v. Hull, 2009 WL 1586832, *2-*3 (W.D. Pa. 2009), set forth the motion to dismiss standard of review, as annunciated by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, (2007), and as refined in Ashcroft v. Iqbal, 556 U.S. 662 (2009), as follows:

> The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). See also Ashcroft v. Iqbal, ---U.S. ----, ----, 129 S.Ct. 1937, ----, 173 L.Ed.2d 868, ----, 2009 WL 1361536 (May 18, 2009) (specifically applying Twombly analysis beyond the context of the Sherman Act). The court must accept as true all allegations of the complaint and all reasonable factual inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir.1985). The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir.2004) citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir.1997). Nor must the court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 556, citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556. Although

the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face."

Id. at 570. In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, *1 (D. Del. 2008) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). "This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 232, quoting Twombly, 550 U.S. at 556 n.3.

## B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

3

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993); <u>Clement v. Consolidated Rail Corporation</u>, 963 F.2d 599, 600 (3d Cir. 1992); <u>White v. Westinghouse Electric Company</u>, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. FED. R. CIV. P. 56(c)(1); <u>see</u> <u>Celotex</u>, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U .S. at 323; <u>see also</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. FED. R. CIV. P. 56(e).

## II.    Statement of Facts

Due to the voluminous allegations contained within the complaint, the Court will dispense with a separate statement of facts and, instead, will apply the undisputed facts to each of Plaintiff's

4

individual claims as they are derived from the pleadings, declarations, and exhibits submitted therewith.

## III. __Discussion__

### A. __RLUIPA Claims__

Under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), "government" is defined as "a State, county, municipality, or other governmental entity created under the authority of a state," and "any branch, department, agency, instrumentality or official," thereof, and "any other person acting under color of State law." 42 U.S.C. § 2000cc-5(4). Accordingly, federal courts have held that RLUIPA "only applies to state and local governments, not a federal prison." Pineda-Morales v. DeRosa, 2005 WL 1607276, *4 (D.N. J. 2005). See also Navajo Nation v. U.S. Forest Service, 535 F.3d 1058 (9th Cir. 2008). Because Plaintiff is a federal inmate, all RLUIPA claims will be dismissed.

### B. __RFRA Claims__

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ..." U.S. Const. Amend. I. It is undisputed that prisoners do not entirely forfeit all constitutional guarantees by reason of their conviction and confinement. Bell v. Wolfish, 441 U.S. 520, 545 (1979). Prisoners, as is well recognized, must be afforded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment. Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972).

However, imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment's right to the free exercise of religion. Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987). Further, it is equally

settled under Bell that "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547-48.

In a subsequent decision, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see also O'Lone, 482 U.S. at 349 (reiterating the Turner standard as the applicable test for prison regulations). These interests include: "deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone, 482 U.S. at 348. This standard implies that a balancing test must be applied between the prisoner's claims and the prison's need of internal order and security. In Turner, the Court set forth four factors to consider in reaching a decision. Turner, 482 U.S. at 89-90.[1]

However, in 1993, Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq. Section 2000bb-1 specifically provides, in part, as follows:

§ 2000bb-1. Free exercise of religion protected

(a)     In general
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b)     Exception
Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person --

---

1.     The factors are: (1) is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it" (citation omitted), Turner, 482 U.S. at 89; (2) does the prisoner have alternate means of "exercising the right that remain open to prison inmates", Id. at 90; (3) what "impact" would "accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison resources generally," Id.; and (4) what "ready alternatives" to the prison regulation exist. Id.

> (1) is in furtherance of a compelling
> governmental interest; and
>
> (2) is the least restrictive means of
> furthering that compelling governmental
> interest.

42 U.S.C. § 2000bb-1. The RFRA expressly provides that its stated purpose is:

> (1) to restore the compelling interest test as set forth in <u>Sherbert v.
> Verner</u>, 374 U.S. 398 (1963) and <u>Wisconsin v. Yoder</u>, 406 U.S. 205
> (1972) and to guarantee its application in all cases where free
> exercise of religion is substantially burdened; and (2) to provide a
> claim or defense to persons whose religious exercise is substantially
> burdened by government.

42 U.S.C. § 2000bb(b)(1), (2).

The RFRA applies to free exercise claims under the First Amendment brought by prisoners. <u>Small v. Lehman</u>, 98 F.3d 762, 768 (3d Cir. 1996); <u>Austin v. Guarini</u>, 1997 WL 47566, *6 (E.D. Pa. 1997); <u>Robinson v. Klotz</u>, 1995 WL 27479, *7 (E.D. Pa. 1995); <u>Boone v. Commissioner</u>, 1994 WL 383590, *7 (E.D. Pa. 1994).

A challenged restraint on the freedom of religion does not fall within the scope of the RFRA, however unless the inmate can establish that a "substantial burden" is placed on his or her ability to exercise said freedom. <u>Small</u>, 98 F.2d at 767. In addressing the issue of what an inmate must show in order to establish a substantial burden under the RFRA, the Third Circuit Court of Appeals stated in <u>Washington v. Klem</u>, 497 F. 3d 272 (3d Cir. 2007), that a substantial burden exists where:

> 1) a follower is forced to choose between following the precepts of his religion and
> forfeiting benefits otherwise generally acceptable to other inmates versus
> abandoning one of the precepts of his religion in order to receive a benefit; or
>
> 2) the government puts substantial pressure on an adherent to substantially modify
> his behavior and to violate his beliefs.

7

Washington, 497 F.3d at 280. This standard is consistent with the standard applied in pre-act First Amendment free exercise decisions. See Thomas v. Review Bd., 450 U.S. 707, 717-18 (1981) (noting that a burden exists when the state's regulation places ". . . substantial pressure on an adherent to modify his behavior and to violate his beliefs . . ."); Graham v. Commissioner, 822 F.2d 844, 851 (9th Cir. 1987) ("This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.") (citations omitted), aff'd sub nom. Hernandez v. Commissioner, 490 U.S. 680 (1989).

Moreover, under pre-RFRA First Amendment free exercise case law, a particular belief had to be shown to be (1) sincerely held, and (2) religious in nature before the First Amendment free exercise protections were deemed applicable. Wisconsin v. Yoder, 406 U.S. 205, 215-19 (1972); Thomas, 450 U.S. at 713-18; Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981), cert. denied, 456 U.S. 908 (1982). Since the passage of the RFRA, it has been held that this threshold showing is still required in First Amendment free exercise claims. Werner v. McCotter, 49 F.3d 1476, 1479 n.1 (10th Cir. 1995), cert. denied, 515 U.S. 1166 (1995) ("Under Yoder, a plaintiff must make two threshold showings to state a prima facie free exercise claim. As the Act (RFRA) makes express reference to the Yoder standard, we see no reason not to read these threshold requirements into the statutory right created by the Act."); see also Muslim v. Frame, 891 F. Supp. 226, 231 (E.D. Pa. 1995) ("[A] plaintiff's burden under RFRA is satisfied by a showing that the government has placed a substantial burden on a practice motivated by a sincere religious belief."). It is only once a substantial burden on religion has been established by the prisoner, that the government must then establish "that it has a 'compelling interest' in its actions and is furthering that interest by the 'least restrictive means.'" Small, 98 F.3d at 767 (citations omitted).

8

Applying the principles set forth above, it is plain that Plaintiff cannot demonstrate a substantial burden on the exercise of his religion from the challenged policy. Moreover, any burden is justified by compelling governmental interests furthered through least restrictive means.

Plaintiff alleges the "on October 1, 2010, [he] sent an Inmate Request to Staff to Supervisory Chaplain Brown stating: I am respectfully requesting to participate in the fast and any other activities associated with the recognition and celebration of the Most Honorable Elijah Muhammad's Birthday on October 7, 2010." (Doc. 1, complaint at ¶ 11). Plaintiff claims that Chaplain Brown "merely stated that Plaintiff had been 'approved' for a day of work proscription, and after a sundown to sundown fast abstaining from food and drink, no meal was provided." Id. However, Plaintiff states that "the defendants totally ignored the Most Honorable Elijah Muhammad's Birthday on October 7, 2010, not even bothering to say they would not provide a break fast meal that evening for those N.O.I. members who had fasted from sundown on October 6th, to sundown October 7th, not having eaten nor drunk anything during this time period." Id. at ¶ 18.

Additionally, Plaintiff claims that "when they (Defendants Hufford and Rodman) verbally committed themselves to do so on October 16, 2010, they failed to follow through on their given word" and "then proceeded to have 'lied' about having provided a break fast meal, telling several different versions of who were responsible for getting this meal to the fast participants; saying that the meals had been prepared, but no one came to retrieve them, etc." Id. at ¶ 19.

Finally, Plaintiff complains that "BOP policy statement P.S. 5360, page #4, g. 'Nation of Islam,' clearly acknowledges and (claims) to recognize the N.O.I.'s three (3) Holy Days, grants work proscription days for all three (3), but however, only consistently and across the board (at all

BOP prisons) provides a meal for Saviour's Day, February 26th, the N.O.I.' s most important Holy Day (The annual liturgical meal); and (supposing) to provide a break fast meal for the Holy Day of Atonement, on October 16th, while providing no such break fast meal for The Most Honorable Elijah Muhammad's Birthday, on October 7th, that is, even though, it is the N.O.I.'s second most important Holy Day, and the self-same obligatory fasting requirements are in place, which defies all reason and logic." Id. at ¶ 31.

Pursuant to Federal Bureau of Prisons' December 17, 2009, "Memorandum for Inmate Population – Work Proscription Days 2010", work proscription for N.O.I. members, was authorized for the following days: February 26, 2010, Savior's Day, October 7, 2010, Savior's Day, and October 16, 2010, Holy Day of Atonement. See (Doc. 32, Ex. 1, Att. 4, Memorandum for Inmate Population). Of these days, October 16, 2010, was the only N.O.I. day of fast recognized by the Bureau of Prisons in 2010. Id. Since not all work proscription days are recognized as days of fast, a special meal at the conclusion of a day of fast is not necessarily provided to those inmates on work proscription. Id. However, inmates who wish to celebrate their faith may fast on their own. Id. In addition, the memo states that Ramadan[2] would begin on August 11, 2010, which is considered a public fast day for N.O.I. faith groups. The memo specifically stipulates that "Other fasts not listed are personal in nature and arrangements for meals upon completion of the fast will not be made." Id.

On October 6, 2010, Defendant, Associate Warden Rodman approved Ford's request to partake in the October 16, 2010, public fast, responding to Plaintiff's October 1, 2010 Inmate

---

2 .    Judicial notice is taken of the fact that Ramadan is a month-long Islamic religious observance that involves spiritual purification achieved through fasting, self-sacrifice, and prayers.

10

Request to Staff Member, he concluded the following:

> This is in response to your Inmate Request to Staff Member dated October 1, 2010,
> in which you request accommodations for religious fasts, and in which you
> complain about the professionalism of a particular staff member.[3]

> October 7, 2010 and October 16, 2010 are Bureau-recognized as days of work
> proscription for inmates whose religious preference is Nation of Islam. Of the two,
> only October 16, 2010 is a Bureau-recognized public fast day. The fast will be
> accommodated by provision of a meal nutritionally equivalent to the meals missed
> only for the Nation of Islam inmates who submit a written request by the required
> due date. Thus, your request for accommodation of a public fast is granted for
> October 16, 2010.

> While professionalism is always expected of staff, it is evident that the Inmate
> Request to Staff form shows confusion in your understanding of what policy is, what
> policy allows, and the relationship between inmates and staff. It is not the role of
> inmates to explain policy to staff. Inmates are encouraged to communicate in a
> clear, respectful manner, and to expect the same from staff. This is presented as
> informational only.

> If you have any questions or concerns regarding the Religious Services Department,
> you should first address them with Chaplain Brown, the Supervisory Chaplain.

(Doc. 32, Ex. 1, Oct. 6, 2010, Response to Inmate Request to Staff Member).

On October 12, 2010, by separate Response to Inmate Request to Staff Member, Defendant,

Warden Hufford, also granted Plaintiff's request for accommodation of the October 16, 2010 fast

day, as follows:

---

3. Plaintiff's complaint about the professionalism of a staff member centers around
his October 1, 2010 "unsuccessful attempt to come to an equitable resolution with
defendant Weidman, in regards to the N.O.I.'s upcoming two (2) Holy Days," by
going "back to this defendant with the relevant BOP written policy statement in
hand" and "instead of conceding, defendant Weidman literally verbally exploded
screaming and hollering at the top of her voice, 'get out of my office now; what do
you mean, I seem confused about what policy says; I know policy'." (Doc. 1,
Complaint at ¶¶ 7, 8).

This is in response to your Inmate Request to Staff Member received on September 29, 2010, wherein you request accommodation of a fast for the Nation of Islam faith group to take place on October 16, 2010.

October 16, 2010, is a Bureau-recognized public fast day and also a day of work proscription for inmates whose religious preference is Nation of Islam. The fast will be accommodated by provision of a meal nutritionally equivalent to the meals missed only for the Nation of Islam inmates who submit a prior written request. Food Services staff, not inmates, will determine the contents of the meal, so there is no guarantee that specific items such as fish or rice will be in it. However, your request for accommodation of this fast is granted.

(Doc. 32, Ex. 1, Oct. 12, 2010 Response to Inmate Request to Staff Member).

On October 13, 2010, Dr. Brown from Pastoral Care issued a memorandum to Defendant, Associate Warden Rodman, notifying him of the inmates who had requested, and been approved, to participate in the October 16, 2010 fast of Holy Day of Atonement. (Doc. 32, Ex. 1, Oct. 13, 2010, Memorandum). Ford's name was listed in the memorandum. Id.

On October 17, 2010, Ford submitted an Informal Resolution Form, claiming that no meal was provided for the October 16, 2010 fast day, and that Food Service "intended to force [Ford's] membership to accept Common Fare meals which 'do not' meet [their] religious dietary needs." (Doc. 32, Ex. 2, Informal Resolution Form).

On October 28, 2010, Chaplain Weidman responded to Ford's claim with the following:

You state that Food Service failed to provide a nutritional meal for the Nation of Islam members who participated in the Holy Day of Atonement public fast. You further state that Food Service intended to force Nation of Islam membership to accept Common Fare meals. You further state that Common Fare meals do not meet your religious dietary needs and no meals whatsoever were provided.

The nutritional meals were provided for the Nation of Islam participants who were approved for the day of fast. Per the Cook Supervisor, the meals were available. What is required by policy is to provide for meals missed.

(Doc. 32, Ex. 2, Response to Inmate Request for Informal Resolution).

Although Plaintiff alleges that Defendants "lied about having provided a break fast meal, telling several different versions of who were responsible for getting this meal to the fast participants, saying that meals had been prepared but no one came to retrieve them, claiming they were left with the Captain, then they say these meals were left with a lieutenant," see (doc. 1, complaint at ¶ 19), the record demonstrates that Chaplain Weidman's response is confirmed by Warden Hufford's November 29, 2010 Response to Plaintiff's Request for Administrative Remedy, in which he notifies Plaintiff of the following:

> This is in response to your Request for Administrative Remedy received on November 17, 2010, in which you complain as a participant in a Public Fast, you were not notified when to report to Food Service to receive you meals. For relief, you request restitution and staff involved be terminated.
>
> An inquiry into to your request revealed the following. On October 13, 2010, a memorandum was posted on the Religious Services' message board, notifying all inmates participating in the Public Day of Fast, to pick up their meals on October 16, 2010, during the evening meal. Furthermore, this procedure was verbally communicated to all inmates participating in the Fast by the Chaplain. Additionally, the Cook Supervisor notified the Operations Lieutenant the location of all meals not picked up by inmates participating in the Fast. You failed to pick up your meal.
>
> Based on the above information, your Request for restitution and termination of staff are not approved.
>
> If you are not satisfied with this decision, you may appeal to the Regional Director, Federal Bureau of Prisons, U.S. Customs House, Second and Chestnut Streets, Philadelphia, Pennsylvania 19106, within 20 calendar days of the date of this response.

(Doc. 32, Ex. 2, Response). Plaintiff appealed the Warden's response to the Regional Director, who denied Plaintiff's appeal on January 6, 2011, affirming the Warden's November 29, 2010 response. (Doc. 32, Ex. 2, Response). Although the record does not demonstrate that Plaintiff appealed this Administrative Remedy to final review, it does competently support the fact that Plaintiff did not pick up his meal for the October 16, 2010 Public Day of Fast.

However, even accepting Ford's allegations as true in the light most favorable to him, that no bagged meal was provided, "if the prisoner's diet ... is sufficient to sustain the prisoner in good health, no constitutional right has been violated." Alexander v. Carrick, 31 F. App'x 176, 179 (6th Cir. 2002). Thus, Ford fails to state a claim.

Even if FCI-Schuylkill was responsible for Ford missing one public fasting meal, missing one meal did not affect his good health or his ability to practice his religion. Moreover, a short-term and sporadic disruption of his Muslim eating habits does not, under these circumstances, allege a substantial burden on his religious freedom. Kennedy v. Boardman, 91 F.3d 30, 33 (7th Cir. 1996) ("A prisoner's right to freely exercise his religious beliefs does not depend upon his ability to pursue each and every aspect of the practice of his religion.") (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987)); Johnson-Bey v. Indiana Dept. Of Corr., 668 F. Supp. 2d 1122, 1129 (N.D. Ind. 2009) (concluding that isolated negligent act cannot support claim that plaintiffs were denied First Amendment right to freedom of religion); Gallagher v. Shelton, 2009 WL 902397, *6 (D. Kan. 2009) (ruling that isolated instance related to an untimely approval of request for accommodation was, at most, negligence, and insufficient to state a claim for relief under section 1983).

The second Turner factor "requires a court to assess whether inmates retain alternative means of exercising the circumscribed right." Fraise v. Terhune, 283 F.3d at 518. Here, Ford was not actually prevented from exercising any religious right. He had the opportunity to observe religious holidays and participate in holiday meals, fastings and prayers. There was no need to find alternative means of allowing him to exercise his religious beliefs when he was fully able to participate in N.O.I. activities.

The final two Turner factors "focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources." DeHart v. Horn, 227 F.3d at 57. Again, because Ford does not allege that he was prevented from exercising his religious beliefs, these two factors do not support Ford's claim.

After applying Turner's rational basis factors to this case, it is clear that Ford's First Amendment claim fails.

Furthermore, Ford's claim under the RFRA should be dismissed because he has not experienced a substantial burden on the exercise of his religion. Ford does not allege that he was actually prevented or that staff even attempted to coerce him to violate any of his religious beliefs. Thus, he has failed to show that Defendants have placed a "substantial burden" on his religious practices, and his RFRA claim fails as a matter of law.

Finally, to the extent that Ford argues that "his religious community had stumbling blocks placed in their path at every turn," that the schedule was "around...30 minutes in actual time, although The Honorable Elijah Mohammad said that our meetings should not be under one hour," that "the BOP refuse[d] to allow one of the N.O.I.'s volunteer ministers" and they do not "treat the N.O.I. Holy Days with the same reverence that hey have and continue to afford to the other various religious communities on their Holy Days", see (doc. 46, brief in opposition at 21-22), once again, Ford does not allege that he was actually prevented, or that staff attempted to coerce him, to violate any of his religious beliefs; and despite his elaborations on his allegations, his brief in opposition offers no evidence to the contrary. Thus, Ford has not shown that Defendants have placed a "substantial burden" on his religious practices, and his RFRA claim fails as a matter of law.

## C. Due Process Claims

Ford challenges a November 24, 2010, disciplinary hearing, where he was found guilty of

Engaging in or Encouraging a Group Demonstration and Conduction Disruptive to

Security/Orderly Running of a BOP Institution, and sanctioned to thirty (30) days disciplinary

segregation, a six (6) month loss of phone and visitation privileges, and a disciplinary transfer.[4]

See (Doc. 32, Ex. 2, Disciplinary Hearing Officer Report). Specifically, Ford alleges that the

Incident Report[5] was false and that he was denied due process, in that he was not provided with a

copy of the Incident Report within 24 hours, the reporting officer participated in the investigation,

and the DHO was not a Northeast Regional staff member. (Doc. 1, complaint at ¶¶ 26-29).

The filing of a false misconduct report does not violate an inmate's due process rights. The

general rule, as stated in Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), provides that a

_____

4 .     Engaging in or Encouraging a Group Demonstration and Conduction Disruptive to Security/Orderly Running of a BOP Institution are violations of Offense Code 212, and 299, respectively. Pursuant to the 2010 codification of 28 C.F.R. § 541.13, recommendation of a disciplinary transfer, disciplinary segregation and loss of privileges are all available sanctions for these High Category offenses.

5 .     On November 4, 2010, Plaintiff was served with Incident Report No. 2086189 charging him as follows:

> On November 4, 2010, after thorough review of documentation and interviews concerning inmate Edward Ford's Reg. No. 10883-083, Nation of Islam sermon conducted on October 29, 2010, determined it was radical and racially motivated. Specifically, on 11/4/10, Ford admitted to making the statements, however, he indicated they were taken out of context. Ford stated during the sermon, "I'm going to fight the white man to the death." Ford states, "The white man trying to take away our blackness." Ford states, "Why do we look to the white man to tell us what to do." Ford states, "If we come together we can change the reality of slavery." Additionally, Ford states, "I ain't gonna lay down, we got to come together brothers."

(Doc. 32, Ex. 2, Incident Report).

"prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The Plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law." Thus, where a prisoner is provided due process, no constitutional violation results from his being falsely accused of a misconduct.

The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall. . .deprive any person of life, liberty, or property, without due process of law. . . ." The Supreme Court has mandated a two-part analysis of a procedural due process claim: first "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property[,]'" and second, "if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" Ingraham v. Wright, 430 U.S. 651, 672 (1977). If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred. In Wolff v. McDonnell, 418 U.S. 539, 563-73 (1974), where the plaintiffs were deprived of good time credits as a severe sanction for serious misconduct, the Supreme Court held that such inmates had various procedural due process protections in a prison disciplinary proceeding, including the right to call witnesses and to appear before an impartial decision-maker.[6]

_____

6 .    In Wolff, the Supreme Court recognized that prison disciplinary proceedings are not part of a criminal prosecution, and the full "panoply of rights due a defendant in such proceedings does not apply." Id. at 556. Nonetheless, the Supreme Court held that a prisoner facing serious institutional sanctions is entitled to some procedural protection before penalties can be imposed. Id. at 563-71. The Supreme Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative, if the charged inmate is illiterate or if complex

17

Thereafter, the Court in <u>Hewitt v. Helms</u>, 459 U.S. 460, 471 (1983), stated that a state law which "used language of an unmistakably mandatory character" creates a protected liberty interest. Following <u>Hewitt</u> many courts held that a state regulation can create a due process interest -- such as freedom from punitive segregation -- if the rule contains mandatory language such as "shall" or "will." <u>E.g.</u>, <u>Layton v. Beyer</u>, 953 F.2d 839, 848-49 (3d Cir. 1992).

The Court's decision in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), however, marked a shift in the focus of liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner. <u>Id.</u> at 481. In <u>Sandin</u>, the Court was presented with the procedural due process claims of a state prisoner who had been found guilty of misconduct and sentenced to thirty days in disciplinary segregation. <u>Id.</u> at 474-76. The Court first found that the approach adopted in <u>Hewitt</u> – described above -- was unwise and flawed. <u>Id.</u> at 481-84. The Court also rejected plaintiff Conner's argument that "any state action taken for punitive reasons encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation." <u>Id.</u> at 484. The Court reasoned, <u>inter alia</u>, that "[d]iscipline by prison officials in response to a wide range of misconduct" is expected as part of an inmate's sentence. <u>Id.</u> at 485. The nature of plaintiff Conner's confinement in disciplinary segregation was found similar to that of inmates in administrative segregation and protective custody at his prison. <u>Id.</u> at 486.

---

issues are involved; (5) a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. <u>Id.</u>

An additional procedural requirement was set forth in <u>Superintendent, Massachusetts Correctional Inst. at Walpole v. Hill</u>, 472 U.S. 445, 453-56 (1985). In that case, the Court held that there must be some evidence which supports the conclusion of the disciplinary tribunal.

Focusing on the nature of the punishment instead of on the words of any regulation, the Court held that the procedural protections in Wolff were inapplicable because the "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." Id. The Court examined the nature of Conner's disciplinary segregation and found that "[b]ased on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment." Id. In the final holding of the opinion, the Court stated "that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in Wolff." Id. at 487 (emphasis added).[7]

Even if the Wolff requirements were not complied with at the misconduct hearing, Ford's complaint, in light of Sandin, is without merit because Ford does not have a liberty interest in remaining free from disciplinary confinement[8] and the procedural due process protections set forth

_____

7 .    The Sandin Court relied on three factors in making this determination: (1) confinement in disciplinary segregation mirrored conditions of administrative segregation and other forms of discretionary confinement; (2) based on a comparison between inmates inside and outside segregation, the state's action in placing the inmate there did not work a major disruption in the inmate's environment; and (3) the state's action did not inevitably affect the duration of inmate's sentence.
        Furthermore, the majority in Sandin viewed administrative or protective custody as "not atypical" and within the "ordinary incidents of prison life." 515 U.S. at 484-86. Specifically, the Court stated that "Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." Id. at 486. Consequently, the appropriate point of comparison is between disciplinary segregation and other forms of discretionary segregation, not general population conditions.

8 .    Moreover, an inmate generally does not have a liberty interest in assignment to a particular institution or to a particular security classification. See Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005) (stating that the Constitution does not give rise to a liberty interest in avoiding transfers to

19

in Wolff do not apply. Furthermore, the incidents of disciplinary confinement in the present case are not materially different than those the Supreme Court found to be "not atypical" in Sandin, and they do not differ appreciably from those of administrative custody.

This Court and others within this Circuit, applying Sandin in various actions, have found no merit in the procedural due process claims presented. See Marshall v. Shiley , et al., Civil No. 94-1858, slip op. at 7 (M.D. Pa. July 26, 1996) (McClure, J.) (holding, pursuant to Sandin, that where the plaintiff alleges only that he was sentenced to sixty (60) days in disciplinary segregation, under Sandin, he cannot assert a claim for the violation of his Fourteenth Amendment rights); Muse v. Geiger, et al., Civil No. 94-0388, slip op. at 4 (M.D. Pa. September 29, 1995) (Nealon, J.) (holding, pursuant to Sandin, that the procedural due process claims were meritless because the punishment twice imposed was thirty (30) days in disciplinary segregation (which differs little from administrative segregation)); Beckwith v. Mull, Civil No. 94-1912, slip op. at 9-12 (M.D. Pa. September 27, 1995) (McClure, J.) (holding, pursuant to Sandin, that the procedural due process

---

more adverse conditions of confinement); Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Montayne v. Haymes, 427 U.S. 236, 243 (1976); Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976) (noting that prison classification and eligibility for rehabilitative programs in the federal prison system are matters delegated by Congress to the "full discretion" of federal prison officials and thus implicate "no legitimate statutory or constitutional entitlement sufficient to invoke due process"). See also Sandin, 515 U.S. at 484-86 (holding that a liberty interest is implicated only where the action creates "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or creates a "major disruption in his environment").

Thus, the placement of prisoners within the federal prison system is among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Meachum, 427 U.S. at 225. As Ford's transfer was well within the available sanctions to impose, it was a legitimate disciplinary transfer, within the BOP's broad discretion with respect to internal operating decisions, that served to preserve the order, security, and discipline within the prison facility. Therefore, the Court finds no violation of a protected liberty interest with respect to Ford's disciplinary transfer.

20

claims must fail because the punishment was twenty (20) days in disciplinary segregation); Sack v. Canino, 1995 WL 498709, *1 (E.D. Pa. 1995) (holding in the alternative, pursuant to Sandin, that the defendants deserved summary judgment on the procedural due process claims because plaintiff's punishment was thirty (30) days in disciplinary segregation); Brown v. Stachelek, 1995 WL 435316, *3-4 (E.D. Pa. 1995) (determining that pursuant to Sandin, the plaintiff's procedural due process claims would be dismissed because plaintiff's punishment was thirty (30) days in disciplinary segregation); Colatriano v. Williams, 1995 WL 396616, *2-3 (D. Del. 1995) (holding, pursuant to Sandin, that neither the Due Process Clause nor state law supported plaintiff's procedural due process claims because his punishment (at most ninety (90) days in "close custody" and a loss of "minimum status") was not outside the scope of his sentence and did not otherwise violate the Constitution). Considering the rules of law set forth in Sandin, this Court finds that Ford's due process claims resulting from his placement in disciplinary segregation are meritless because he had no protected liberty interest in the first place. Moreover, the Third Circuit Court of Appeals has held that prolonged confinement in administrative custody is not cruel and unusual punishment in violation of the Eighth Amendment. Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997). An inmate placed in administrative custody pursuant to a legitimate penological reason could "be required to remain there as long as that need continues." Id.

Moreover, to the extent that Plaintiff seeks the expungement of the disciplinary proceeding, as well as damages, in Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court ruled that a constitutional cause of action for damages does not accrue "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render

21

a conviction or sentence invalid," until the plaintiff proves that the "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87.

In Edwards v. Balisok, 520 U.S. 641 (1997), the Supreme Court extended the rationale in Heck to disciplinary proceedings, holding that the expungement of the inmate disciplinary proceeding would imply the invalidity of the underlying disciplinary action: "[t]he principal procedural defect complained of by the respondent would, if established, necessarily imply the invalidity of the deprivation of his good-time credits." Edwards, 520 U.S. at 646. Accordingly, an inmate may not bring a civil rights action for damages related to an inmate disciplinary proceeding without first challenging and overturning, via appropriate proceedings, the disciplinary hearing in question. Id. at 646-47.

Ford's action specifically seeks damages as well as the expungement of the disciplinary proceeding. However, an award of damages would implicate the validity of the underlying disciplinary proceedings. Because the disciplinary proceeding has not been determined unlawful, it is appropriate to dismiss the Plaintiff's claim for damages as he cannot, under Heck, maintain a Bivens[9] action for unlawful imprisonment until the basis for that imprisonment is rendered invalid.

Ford fares no better in attempting to set forth a due process claim based on the obstruction of his misconduct appeal procedure claim. Prisoners do not have a constitutional right to prison grievance procedures. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119,

---

9 .    The Heck and Balisok rulings have been held applicable in Bivens proceedings as well as §
1983 actions. Clemente v. Allen, 120 F.3d 703, 705 (7th Cir. 1997).

137-38 (1977); Heleva v. Kramer, 214 Fed. Appx. 244 (3d Cir. 2007) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001)). Therefore, to the extent that Ford seeks to impose liability against any of the named Defendants for their role in denying or failing to respond to his administrative grievances and/or appeals, those Defendants are entitled to dismissal of these claims in their favor.

Guided by the above case law, Ford's allegations that he was issued a falsified misconduct report, that he didn't receive the incident report within twenty-four (24) hours, that the reporting officer participated in the investigation, and that the DHO was not a Northeast Regional staff member, did not violate his due process rights as thirty (30) days in disciplinary confinement does not constitute an "atypical and significant hardship" so as to trigger due process protection. See Sandin, 515 U.S. 472; Griffin, 112 F.3d 703. Therefore, because he was not deprived of a protected liberty interest, his challenge to the issuance of the misconduct charge is only actionable if Defendants issued the misconduct in retaliation for Plaintiff having exercised a constitutional right. See Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (citing Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)).

### D. Retaliation Claim

Plaintiff argues that "defendant Weidman deliberately made false statements, which she attributed to the Plaintiff in her (so-called) Supporting Memorandum, in a reprehensible premeditated act of 'retaliation' for the Plaintiff having lodged a formal complaint against her, and in furtherance of said conspiracy." (Doc. 1, complaint at ¶ 54). Based on this assertion, Plaintiff posits that Defendants "Scandle, Reisinger and Meyer 'all' lied on the BOP official agency

documents, wherein, they falsely state that Plaintiff had admitted having made the body of statements as expressed in the incident report and defendant Weidman's supporting memorandum." Id. at ¶ 56.

To establish a retaliation claim, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. Rauser v. Horn, 241 F.3d 330, 333 (2001). Second, a prisoner must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." Id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied upon showing that "the action 'was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" Id. (quoting Allah, 229 F.3d at 225). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." Id. (quoting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Once a plaintiff meets the threshold requirements, the burden shifts to the defendants, who must "prove, by a preponderance of the evidence, that it would have taken the same disciplinary action even in the absence of the protected activity." Id. In analyzing the defendants' burden, however, it must be recognized that the task of prison administration is difficult and the decisions of prison officials require deference. Id. at 334. Accordingly, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. Id. at 334.

24

While the Court recognizes that the filing of administrative grievances "implicates conduct protected by the First Amendment, see Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), the record before this Court is devoid of any evidence that Plaintiff suffered "adverse action" at the hands of prison officials, or that the exercise of his constitutional rights was a "substantial or motivating factor" in the challenged decision. Rauser, 241 F.3d at 334. Plaintiff's thirty (30) day sanction in disciplinary segregation does not constitute an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin at 484. However, even if it could be considered "adverse action", Plaintiff's "complaining against other employees" was not the motivating factor in Defendant Reisinger's decision to issue Plaintiff a misconduct. The record clearly demonstrates that Plaintiff engaged in inciteful activity, considered as disruptive to the security and orderly running of a facility. Accordingly, Defendant Reisinger properly issued an incident report, and Ford's retaliation claim will be denied.

To the extent Plaintiff argues that Defendants "have by their actions of disciplining [him] for allegedly having made racial statements that, even if true, were well within the boundaries of the well-known N.O.I. theology amounts to 'undue censorship'," (doc. 1, complaint at ¶ 21), "free speech is not absolute at all times and under all circumstances". Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571–72, (1942). A prisoner's exercise of his First Amendment freedoms may be curtailed if such speech poses "the likelihood of disruption to prison order or stability, or otherwise interferes with the legitimate penological objectives of the prison environment." Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132 (1977). In this case, prison officials determined that the content of Ford's comments constituted a security concern. Given the

nature of the comments, there is no indication that the Plaintiff engaged in constitutionally protected activity. Consequently, Defendants are entitled to summary judgment with respect to this claim.

### E. Conspiracy

As to Plaintiff's claims of conspiracy, in order to demonstrate a conspiracy, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of state law.'" Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)). Plaintiff has concluded that Defendants have conspired to violate his rights yet he has failed to evidence any facts showing an agreement or plan formulated and executed by the Defendants to achieve this conspiracy. Plaintiff cannot rely on unsupported claims of conspiracy. Without a factual showing which gives some substance to the conspiracy claims, Plaintiff's claim amounts to nothing more than mere conjecture and bare speculation. The law is clear that bare allegations of wrongdoing by a Defendant, without any substantiating proof of an unlawful agreement, are insufficient to sustain a conspiracy claim. See Young vs. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991) (concluding, conspiracy claims which are based upon pro se plaintiff's subjective suspicions and unsupported speculation properly dismissed under § 1915(d)).

Also, to survive a motion for summary judgment, the plaintiff must establish that there is a genuine issue of material fact regarding the question of whether the defendants entered into an illegal conspiracy which caused the plaintiff to suffer a cognizable injury. Massachusetts School of Law at Andover v. American Bar Association, 107 F.3d 1026, 1039 (3d Cir.), cert. denied, 522

U.S. 907 (1997). In other words, to successfully counter the defendants' motion for summary judgment, the plaintiff must provide specific evidence establishing that the defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose. Vieux v. East Bay Regional Park Dist., 906 F.2d 1330, 1343 (9th Cir.), cert. denied, 498 U.S. 967 (1990).

Here, Plaintiff has failed to introduce into this record any evidence which shows an agreement or plan formulated and executed by Defendants or anyone else which rises to the level of a conspiracy. At a minimum, absent some modicum of proof which tends to reveal the existence of an agreement which is designed to deny the constitutional rights of Plaintiff, he cannot maintain his conspiracy claim. In sum, Plaintiff's allegations, standing alone, are patently insufficient for a reasonable jury to return a verdict in his favor. Defendants' motion for summary judgment will be granted.

### F. Equal Protection Claim

Ford asserts a legal conclusion that Defendants violated his constitutional right to equal protection, alleging that the disciplinary action against him, the handling of work proscriptions and post-fasting meals, the limiting of times of day when outside N.O.I. members may enter the prison, and the denial of his request for a longer period of time for certain religious services were acts of racial discrimination. Such a legal conclusion is not supported by any facts.

Equal protection claims are subject to a two-part analysis. In order to state an equal protection claim, a plaintiff must first show that he has been treated differently from similarly-situated individuals. City of Cleberne, Tex. v. Cleberne Living Center, 473 U.S. 432, 439 (1985) (finding that the Equal Protection Clause of the Fourteenth Amendment directs that all

persons similarly situated should be treated alike (citing <u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982)). If the plaintiff makes such a showing, then the defendant would have to show that the different treatment is rationally related to a legitimate state interest. <u>Id</u>. at 440 (citations omitted); <u>McGinnis v. Royster</u>, 410 U.S. 263, 270 (1973) (finding that the challenged distinction (state classifications used to determine parole eligibility) rationally furthers a legitimate, articulated state purpose). "The standard for equal protection analysis in relationship to prisoners qua prisoners (i.e., in the absence of other characteristics that may make an individual a member of a suspect class) is rational basis, not heightened scrutiny." <u>Scott-El v. U.S. Parole Com'n</u>, 2006 WL 2671399 *3 (M.D. Pa. 2006) (citing <u>Jackson v. Thornburgh</u>, 907 F.2d 194, 196-7 (D. D.C. 1990); <u>Thornton v. Hunt</u>, 852 F.2d 526, 527 (11th Cir. 1988)); <u>Moss v. Clark</u>, 886 F.2d 686, 690 (4th Cir. 1989) (holding that prisoners are not a suspect class), <u>citing Thornton</u>, 852 F.2d at 527).

Ford's equal protection claim fails because his complaint is devoid of any allegation that he was treated differently from other similarly situated prisoners. In fact, Ford provides nothing more than his opinion that every action or decision by Defendants with which he disagreed was an act of racial discrimination. Additionally, he requests to be treated more favorably than other inmates with increased access to chapel resources. He does not demonstrate how he was treated differently than any other class of inmate. Accordingly, Ford fails to adequately plead an equal protection claim, and such claim will be dismissed.

### G. Administrative Procedures Act

The Administrative Procedures Act ("APA") permits judicial review of an agency action made reviewable by statute and final agency action for which there is no adequate remedy in a

28

court. See 5 U.S.C. § 704. A person suffering legal wrong because of agency action within the meaning of a relevant statute is entitled to judicial review under the APA unless: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. §§ 701(a)-702.

Plaintiff alleges that the "individual defendants further violated the Administrative Procedures Act by not adhering to their own agency's written policy guidelines." (Doc. 1, Complaint at ¶ 1). He claims that the "Administrative Procedures Act (APA) allows for agencies such as the BOP to formulate and implement their own written policy guidelines, but however, once they have been written and published for the public's information, view and have been duly implemented, said written policy guidelines 'must' be strictly adhered to and enforced by the agency in question." Id.

Petitioner's cursory references to the Administrative Procedure Act do not amount to a viable challenge because "BOP's internal agency guideline[s]" are not subject to the notice and comment requirements of the APA. See Reno v. Koray, 515 U.S. 50, 61 (1995); see also Royal v. Tombone, 141 F.3d 596, 600 (5th Cir. 1998) (rejecting a prisoner's argument that BOP's change in policy was invalid because it was not promulgated in accordance with the APA, as agency guidelines are "promulgated internally and may be altered at will by the BOP"); Koray v. Sizer, 21 F.3d 558, 562 (3d Cir. 1994) (finding that internal agency guidelines may be altered by the BOP at will and are not subject to the notice and comment requirements of the APA), rev'd on other grounds sub nom Reno v. Koray, 515 U.S. 50 (1995).

**H. Injunctive Relief**

29

To the extent Plaintiff seeks injunctive relief in his complaint, it is well recognized that the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy." Steffel v. Thompson, 415 U.S. 452, 459 (1974). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Id. at 459 n.10 (citations omitted). "Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects." Rosenberg v. Meese, 622 F.Supp. 1451, 1462 (S.D.N.Y. 1985) (citing O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)). A prisoner's transfer or release from prison moots his claims for injunctive or declaratory relief since he is no longer subject to the conditions he alleges are unconstitutional. Abdul-Akbar v. Watson, 4 F.3d 195, 206-207 (3d Cir. 1993); see also Weaver v. Wilcox, 650 F.2d 22, 27 (3d Cir. 1981) ("[A] prisoner lacks standing to seek injunctive relief if he is no longer subject to the alleged conditions he attempts to challenge.").

In the case sub judice, Plaintiff has been transferred from FCI-Schuylkill to the United States Penitentiary in Coleman, Florida ("USP-Coleman"). In light of these circumstances, there is nothing in the record to suggest that there exists a reasonable probability of Plaintiff's return to FCI-Schuylkill in the foreseeable future. Consequently, Plaintiff's claim for injunctive relief is moot and will be dismissed. See Fortes v. Harding, 19 F. Supp. 2d 323, 326 (M.D. Pa. 1998) ("Fortes' transfer to another institution moots any claims for injunctive or declaratory relief.").

A separate Order will be issued.

Dated: October 11, 2013

United States District Judge

30